Which brings us to our next case, IBG Trade Station v. Trading Technologies, 2017-2052-5-3, Mr. Pickhard. Welcome back. Good morning. May it please the court, I want to return again to the 101 issue. Set aside in the issue of whether it is legally appropriate to make subsidiary fact findings on the first step, if we look to the claims of the 132 patent, any of the claims in the foreign fault patents here today, as a matter of law, those claims are directed to an abstract idea. As this court has held in Electric Power Group, Amaranth, Interval Licensing, the mere display or processing of information is an abstract idea. Like the patents in those cases, the claims of the 132 and the other patents in these involved matters, they don't either describe or claim any improved engineering of the computer or the software itself. In fact, the steps of the patents are all result-oriented. We have the displaying steps that conclude ultimately with the single action click of a mouse to send a trade. I understand your arguments on the merits, but what do we do? You stood up and said, as a matter of law, these claims are directed to an abstract idea. But isn't this another patent that was in the CQG case and the court expressly said it was not directed to an abstract idea? You didn't even stand up this time and tell me, oh, there's different evidence. You said, as a matter of law, they're directed to abstract. So how do we do that? How do we say, when another panel of this court has looked at the exact same patent, the exact same claims, the exact same issue, and you just said, as a matter of law, we should do the opposite of what they did? I do want to clarify the first point. So perhaps I misunderstood Judge Lurie's statement up front. So it is our first-line position that, given the differing factual records of these cases and CQG- I get it. I get it. You're not waiving that argument. Absolutely not. You're just saying I'm trying not to retread on the thing we already argued over. That is our absolute first position. Okay, I will absolutely take everything that you say thereafter with the caveat that everything you said in the first argument equally applies here. And I won't make you re-say it. All right, go ahead. I'm telling you something that's unremarkable. The 304 and the 132 patents essentially rise and fall. The records are insignificantly different to require different- Do you want to deal with obviousness? Yes, so if we talk about the three claims that the board found to be non-obvious, and just to orient this court, these were claims 29, 39, and 49, and they require showing the last quantity traded and the last traded price. The prior art showed the last quantity, last traded price, forgive me. That was in the Gutterman reference. It is also shown, and what the board found missing there was the last traded quantity. Of note, figure two in the patent, which the patentee admits is prior art to the 304 claims, associates the last traded quantity with the last traded price. The patent itself says that markets won't accept orders if it doesn't have at least the trade order price and the trade order quantity. So we argue to the board that having disclosed the last traded price in Gutterman, the idea of associating last traded quantity would have been obvious, and what the board did that was erroneous, it applied an inflexible obviousness standard and simply looked at the art and said, well, the element is missing, and it stopped there and didn't go the next step to decide whether it nevertheless would have been obvious, given what was not disputed about, what was in the content of the prior art. And we also submit that something as trivial as providing some additional information that was known in the art to be used in these GUIs is not something that ought to be given patentable weight. That is our position on the one-on-two. If there are no further questions on that, I'll return to the Alice issue. So we believe, of course, that the differing factual records require a different conclusion as to step one of Alice. And then if we turn to the second step under Alice, there's nothing in these claims that would indicate the presence of an inventive concept. As I mentioned in the first argument, the patent itself states that it can be implemented on essentially any computer. It states that it uses simple algorithms. It is agnostic as to how the information that is displayed is mapped from the processor to the GUI. It doesn't disclose any particular engineering techniques. It doesn't purport to improve the functioning of the processor, the networks that are used to connect to the exchange, or how the GUIs program. Okay, I don't want to hear any more about this. So I'd like to move you, though, to corroboration. I know it's technically his appeal, but we're way past that at this point. So just tell me about printed publication, public accessibility, and corroboration. You'll get your chance, you know, if you don't mind. Or save all your time for rebuttal to talk about that whichever way you want to do it. Your choice. Well, I'm happy to. If there's a particular point on the corroboration that I can address, I'd like to do that. Otherwise, I'll simply point out here that we do have corroborated evidence of the public availability of the TSC manual. Mr. Kawashima testified both in the district court and in a deposition at the PTAB about how the TSC manual was disseminated. He talked about the data in which it was disseminated. Yeah, but there's a question about whether or not his testimony needs to be corroborated. Right, and his testimony is corroborated by other documents in the record, including the TSC manual itself. Which has its date on it. The TSC manual has the date. And even though you didn't translate everything into English, the date is the date. You can see it pretty clearly, right? Well, we have a translated version of the manual itself. There's some other documents. No, it wasn't entered. I thought, if I remember the facts right, a translated version wasn't proffered in this case to the office. Is that right? I'm not aware of that point. But it wouldn't matter because the date is sort of universally understood. It's a bunch of numbers. Mr. Kawashima was deposed about what date was in that manual. He had a translator present. Submit that that's sufficient. If you look at what's in the Joint Appendix, the date is quite clear what it is. He also testified as to the lead up to the dissemination of the TSC manual. If you look in the record at Joint Appendix 9661 and thereafter, he talked about in the 1997 period that there was a briefing of market participants to alert them of the changes that were coming, the new trading interface that the exchange would use. And then we see in 1998, Mr. Kawashima testifies that, again, there's a notice and the manuals themselves, and the participants were invited to come in and receive them. Mr. Kawashima says that he distributed them. The board looked at all that evidence, including the reference itself, the TSC manual, and said that the things that are in the manual confirm what Mr. Kawashima said, not just the date, but confirmed that the manual was there to teach traders how to use this new interface, as well as the market participant, administrative people, how to connect to the interface and the exchange itself. Judge, I don't know if you want to hear on the public dissemination point as well or just the corroboration. That's our brief. I'll reserve the remainder for rebuttal. We'll hold it for you, Mr. Picard and Ms. Allen. As I mentioned, you needn't be repetitive. Thank you, Your Honor. I just would like to quickly just clarify the issue we were discussing earlier. I don't think trading technologies hasn't pointed to anything in these particular statutes that would prevent the board from considering the constitutional retroactivity challenges that they're now raising to this court. Unlike the case that they cite, it would not have been futile for them to raise these issues before the board because the board could have declined to institute review or could have terminated review if the board agreed. With respect to whether the board could consider these issues, this case is in the same posture as In Re DBC, where the parties had raised an appointments clause challenge to the Board of Patent Appeals and Interferences. This case is in the same posture as that case, so we do think the board would have had jurisdiction to consider it. To consider takings claims and to consider right to a jury trial in the Seventh Amendment, you think those are within the board's jurisdiction to decide whether there's a Seventh Amendment right to a jury trial? Is something an administrative body can decide as a matter of law? The board could have decided the issue and then declined to institute review if they agreed that it wasn't proper to continue with covered business method review of these patents because they issued prior to the AIA. I just want to make sure, I know we've talked a lot about forfeiture, but I want to make sure that the primary reason I'm here is to answer any concerns that the court has on the due process and the takings issue. I want to make sure that I've addressed any concerns that you all have about either of those cases and those arguments. Again, we think this case is easier than PATLEX on the due process issue and then on the takings issue. We think a cancellation certificate would only be issued after this court has also determined any claims are unpatentable. At that point, it rests on both the determination from this court and from the PTO that there never was a valid property interest in the first place. In that sense, it's very similar to when a district court would find a patent invalid in litigation. I think that's it. Thank you, Ms. Allen. Mr. Cannon? The 103 challenge hinges on the TSE manual. TT has been dealing with this TSE manual for 15 years. These patents have been re-examined and allowed over TSE. We had a trial in the Eastby case back in 2007 based on the same evidence. The TSE manual and the testimony from one witness, Mr. Kawashima, and the jury in that case found that that reference did not even qualify as prior art. Are you going to address the corroboration requirement that you argued? Yes. In the last 10 years since the Eastby case, nothing's changed. There's no new evidence in the case. Here, the board erred because the board thought corroboration wasn't even required in the first instance. Did it say that, or did it say that the combination... Because it points out that the document has its own date on the front, and then you have the testimony of... How do you say his name? Kawashima. Kawashima. Mr. Kawashima. Aren't those two things corroborative of each other? I think what the board did was the board said, you don't need corroboration. The reason why the board said that is because IB was arguing, you do not need corroboration when you're talking about public accessibility or whether the witness is interested or not. So the board never looked at that. I believe the board never considered the corroboration issue at all. Do you agree that the combination of the date on the... I'm not trying to sandbag you. Are you familiar with the Nobel Biocare Services case that was issued from this court in September of 2018? It's not in your briefs because your briefs were filed prior to the issuance of this case. I'm aware of the case. Okay, because that case expressly holds that the date on the document in combination with testimony is sufficient. I actually respectfully disagree with that, Your Honor. The testimony of the actual distribution of 1998, there's no corroboration of when Mr. Kawashima allegedly gave the document out. The date on the TSC manual is not a copyright date. It doesn't indicate public accessibility. It's just a date on a document, which could mean... This is the rule of reason. It's a question of fact under the rule of reason. If I read the board's opinion as holding that the date on the document is the likely date it was circulated and that that's what Mr. Kawashima says, isn't that enough of a standard review? I mean, that's your problem. I mean, maybe I wouldn't have decided it the same way in the first instance. Maybe you're making a compelling case that the board should have bought, but that's a pretty tough case on appeal. Well, see, the problem, Judge Moore, is that IB, this argument about corroboration, this is a new argument that's made on appeal for the first time. They never argued that below because they were telling the board, you don't need corroboration. And why were they arguing that? Because they didn't have corroboration. A date that's not copyrighted, just a random date on a document, does not corroborate his testimony that he gave the date out in 1998. What about when you say it doesn't? First off, that's a question of fact. You can't say that as though it's a rule of law that this date, unless it's a copyright date, it can never be sufficient for corroboration. It's a question of fact under a rule of reason approach. It's a question of fact. But, again, at best, that date would only suggest, at best, when the document was generated internally. The question is, does a date that's not copyrighted, does that indicate that Time out, time out. I get my Washington Post every day. It has the day I receive it on it. Are you telling me that's the day it was generated? It wasn't. It was generated the night before. Well, but here, though, what matters is, was the document actually handed out on that date? And that's the problem. The problem is that that date doesn't corroborate that testimony. And in the 10 years since the Eastby trial, we do not have any other evidence from a third party actually having the manual, no log of somebody who actually picked the manual up, no emails, no testimony from any other party. That's why they were telling the board, you don't need corroboration, and that's why the board never even looked at it. And now I'd be saying, oh, we're going to make a new argument on appeal. It was corroborated. There's a second reason why TSE doesn't qualify as prior art, and that is the public accessibility issue. TSE was not publicly accessible to persons of ordinary skill in the art. This is not a library case. It's interested persons, right? Isn't that the standard, interested persons? It's a person of ordinary skill in the art. You believe that the legal standard is it has to be distributed to persons of skill in the art. It has to be. A person of ordinary skill in the art exercising reasonable diligence has to be able to have access or get access to the document. There has to be some pathway. And so in this case, this is not a library case where you can go to the library and get it. It's not a trade show case or some other public meeting. So there's no pathway for a person of ordinary skill in the art to get the document. And so here's the problem, and this is the problem with the entire group. Well, who is Mr. Kawashima saying the documents were distributed to? That's the problem. The problem is the testimony is he said he handed out a few copies to. . . 200. No, he actually testified. The testimony originally, the original testimony was, hey, this manual was given out to 200 people. But in the second deposition, it wasn't mailed out to these TSE members. There was no mailing out. It wasn't given out to them. The only testimony. . . The board cites Kawashima's testimony to support that two copies of the manual were disseminated to approximately 200 large companies. It seems to me that it's large companies who would be interested or would use the Tokyo Stock Exchange. And in addition to that, the GUI itself was up on the New York Stock Exchange, right? Actually, Judge Raynor, there's no evidence of that, of whether the system was out. No evidence at all. Again, the problem with their case is they're relying. . . And the testimony from Kawashima was he personally handed out a few copies. The problem is we don't know who he gave the document to. We don't know the name of the person. We don't know whether they were posits. So here's the problem. How would a person of ordinary skill in the art ever know how to get the document, even if he did give it out to unidentified people? Where's the roadmap? The board never made any findings that a person of ordinary skill in the art could find that document, even if it was given out to unknown people. That's the problem. There's no link. This case. . . Wait, are you. . . I guess I'm confused. Are you saying for this to be publicly accessible, any person of skill in the art would have had to have been able to locate it? Or what if he actually gave it to five people who were undoubtedly people of skill in the art? I'm just trying to understand what you think the legal standard is. I think in a case where you don't have a library or you don't have a public meeting place where a person of ordinary skill in the art exercising reasonable diligence can get to it, then if it's just, hey, I handed it out, you better have evidence that you gave it to a person of ordinary skill in the art. Or an interested person. I'm not so sure that that state of the law on that is completely settled. I will acknowledge your honor. How do you distinguish your position from our GoPro case then? So the GoPro case was a public meeting place. It was a trade show. It was a trade show for distributors. It was for distributors, right. And this court found that a person of ordinary skill in the art exercising reasonable diligence would have been able to get to that trade show. Right. Here we don't have that. There were no findings how a person of ordinary skill in the art would get to that TSC manual based on the testimony that Kawashima gave it out to who knows, God knows who. We don't know who got it. In a case where you're just giving it out, and I think, Judge Moore, you hit on it, you have to show that you were distributed to a person of ordinary skill in the art. I believe that is the test. Or you have to show some other pathway. You believe that, well, okay. All right. I'm not sure what the test is. Well, under Blue Calypso, it's whether a person of ordinary skill in the art exercising reasonable diligence can find the document. And in GoPro and Acceleration Bay, there's some question about whether that's exactly the correct standard or whether it's actually an interested person. But anyway. Well, so I'm aware of Federal Circuit cases that talk about interested persons. But I believe Blue Calypso and other cases, later cases, make clear that it centers on a person of ordinary skill in the art. And another problem with what the board did, okay, so the evidence is he handed, allegedly, with no corroboration, he handed the document out to unknown people. This case is just like the recent C.R. Bard case from this court. And we filed a 28-J on that case. Was there any evidence concerning specific companies that received the report like Goldman Sachs and Merrill Lynch? There's no evidence in the record of who he gave it to. Not a name of an individual. There's testimony that those companies did have a copy, did receive a copy. Maybe not from him, but they did have a copy. There's no evidence of that. The only evidence of record that came up in his second deposition was there was some meeting that allegedly happened in 1998, and some banks showed up at the meeting. But in terms of the document actually being handed out, there's no evidence of what company got the document. There's no evidence of who actually picked it up for the company. There's no evidence that the company, or anybody in the company, would be a person of ordinary skill in the art. Even if they did get it. Why isn't possession proof of accessibility? If I had the document, why do I need to prove that I had access to it? If the evidence was that the document was handed out, the 200 Goldman Sachs has the document, and they testified to that. Why isn't that evidence that they had access to it? Because the problem is there's no evidence that Goldman Sachs had the document. There's none. There's no evidence of that. I guess the problem is Mr. Kawashima testified, and this is the quote, that it was distributed to about 200 and this is the quote, security companies for banks who traded on the TSC. I'm putting the last part on. So that is a quote from his testimony, and it's located in Exhibit 1010 at pages 11 to 15. It's not going to help you, because you didn't give it to us in the appendix. But that is his testimony, and so what... You gave us an awful lot on the appendices, but not that. Well, so the testimony was, again, it wasn't mailed out. The testimony was allegedly that these members could come pick up the document. But there's no evidence... Members could what? That members could actually come to the TSC to pick the document up. Isn't that access, evidence of access, accessibility, an invitation to come and pick it up? No, because, again, if you think about it from the standpoint of a person of ordinary skill in the art here in Washington, D.C., how would that person of ordinary skill in the art find the pathway to the document, even if it was at a bank? In other words, the law isn't, if the document was given to a... is in the file of a company, that a person of ordinary skill in the art could access the document. That can't be the law. You either have... A person of ordinary skill in the art either has to have access through it, through a library or a public meeting... No, no, no, no, no, no. Why couldn't a person of ordinary skill in the art gain access to it because someone in his company brings it back? That actually is the reasoning that the board used, and the problem is that that's speculation. The board said, well, why couldn't somebody just walking down the street go to a TSC member and get it? Well, the problem is there's no evidence in the record to support that. That's the problem. There's no evidence. The only evidence of record put in by Mr. Kawashima was that he handed it out to who... We don't know who got it. We don't know who got it. And the C.R. Bard case, the recent C.R. Bard case from this court, is highly relevant, Your Honors, because in that case it was the same situation. It was a case where somebody handed the document out, and the testimony was, I gave it to nurses and surgeons and doctors, okay? And this court rejected that because this court said, you didn't identify who got the document. You testified that you just gave it out to people, to nurses and to doctors. That's the C.R. Bard. And that was a factual scenario where the document was just handed out. And if you don't identify who got it, it's not enough. And, again, coming at it the other way, how would a person of ordinary skill in the art access the document, even if it was given to some unknown doctor? Just to clarify, that deposition of Mr. Kawashima, which I have in front of me, and I'm happy to lend you my copy if it would help since it's not in the appendix, but he actually expressly says three or four separate times that it was distributed to 200 companies. All participants who conduct futures option trading received it. So three times he says 200, because you say he testified only he gave out only a couple copies. Three places here he says 200 companies received this. But the evidence was, and it's the site at Appendix 20, Kawashima testified that the document was distributed to 200 companies, but he later clarified that the companies actually picked them up, allegedly picked them up, and he handed out some copies. So, again. Thank you, counsel. You've exceeded your time. Thank you. Mr. Picard has a little rebuttal time. I'd like to make a few points on the Kawashima TFC issue. The board makes a number of factual findings at Appendix 20 through 24 about the circumstances of the dissemination of the TFC manual. If you closely read the briefs in this case, trading technologies does not raise a substantial evidence challenge to any of those fact findings. And as Judge Morris pointed out, the board found, as a matter of fact, that the reference was given out to 200 participants. We know something about it. Yes, but what do you think the legal standard is on who it has to be given to? And how do we know in this case, given the audience there and who a POSA is, that it was distributed to POSAs? Right. So we believe that it is not necessary in a public dissemination case to show that copies of the reference were actually handed to POSAs. Okay. So it was actually given to them. How do we know it was accessible to them? Because it can't just be that if you hand a leaflet on nanotechnology out to a bunch of kindergartners walking down the street, right? It can't just be that that makes it publicly accessible to computer scientists, because maybe one of their parents is, or maybe they'll happen upon it somehow. You understand my problem. I do. So obviously my example is not this example, but that's my concern. I think if we look to GoPro and the Novell BioCare cases, they're very instructive. In both of those instances, you had trade shows. There's no evidence that skilled artisans attended those trade shows. In fact, in the Novell BioCare case, the individual who was handing out the catalogs that testified, he wasn't sure he even brought copies. So you don't think— They managed to produce one. But it has to be publicly accessible to them, doesn't it? It does. And so here we would have a reasonable roadmap for a skilled artisan. You've got the Tokyo Stock Exchange, one of the most prominent exchanges in the world. They have handed out manuals to hundreds of traders in the world. It stands to reason that the skilled artisan looking to improve or build a new trading interface would look to the materials associated with the existing interfaces in the marketplace, including one of the most prominent examples at the Tokyo Stock Exchange. But it wasn't just accessible to anyone who attended the Tokyo Stock Exchange or anybody who was interested in it. It was only given out, arguably, to these 200 people, right, at that one instance. Well, yes. But that was the relevant public for purposes of the TSE manual. But those aren't necessarily people who fall into the category of a POSA or an interested party, necessarily. I mean, the board did make findings, however, that the participants who received these manuals would have had professionals who would be in the business of building GUIs for them. Again, there's no substantial evidence challenges to the board's findings. It's essentially re-arguing the case as if it were being tried in the first instance. Thank you, counsel. We'll take that case under advisement.